**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3391-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JERMAINE VENABLE, a/k/a
JERMAINE R. VENABLES,
JERMAINE ALFORD,
JAMIR SAULTERS,
JERMAINE SAULTERS,
and RASHEED LATIFF,

     Defendant-Appellant.

_____

Argued December 11, 2024 – Decided March 13, 2025

Before Judges Currier, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-10-2532.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Rachel M. Lamb, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Rachel M. Lamb, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions and sentence after a jury trial. He alleges, among other things, that the trial court erred in: allowing unreliable expert ballistics testimony; improperly precluding relevant third-party guilt evidence; and failing to provide proper jury instructions. Defendant also seeks to vacate his conviction for conspiracy and asserts that his sentence is excessive. After a careful review of the factual record and applicable principles of law, we discern no error and affirm.

I.

On July 30, 2018, at approximately 7:42 a.m., someone on a bicycle fired a semiautomatic handgun five times into a silver Toyota at the intersection of Fourth Avenue and Kaighns Avenue in Camden, causing the death of Johnathan Rojas and injury to a passenger—Devon Fisher. The shooter then got off the bicycle and into a car.

There were no eyewitnesses to the shooting, but there was one witness who saw the bicyclist afterwards. Alan Franchi testified that immediately after the shooting, at approximately 7:43 a.m., he saw a group of people running down

Kaighns Avenue, followed by a person riding a red bicycle. He described the bicyclist as a tall and thin man, "dressed all in black," and wearing a black ski mask. Franchi saw the man get off the bicycle, which he left on the side of the street before getting picked up by the driver of a silver SUV on the corner of Third Street and Kaighns Avenue, one block away from the shooting. Franchi jotted down the SUV's New Jersey license plate number, which a testifying detective later identified as a silver Chevrolet SUV.

At the scene, officers observed bullet holes in the front windshield of the Toyota, a broken driver's side window, cigarette butts, broken glass, and five bullet shell casings, each marked "Win 40 S&W." After procuring a warrant, police searched the Toyota and observed apparent bullet holes in the dashboard and front passenger seat. Bullet fragments were found embedded inside the dashboard area, under the driver's seat, and on the rear passenger's side seat. Shell casings and a suspected bullet specimen were found at the scene and other bullet specimens were recovered from Rojas's body. Partial latent fingerprints were recovered on both front exterior doors and the sunroof.

Footage from multiple surveillance cameras and a ShotSpotter activation recording corroborated Franchi's testimony. Sergeant Gordon Harvey of the Camden County Police Department testified about the surveillance videos

obtained from the area of the shooting. He explained that multiple video clips from the surveillance footage depicted that the Chevy was in the immediate area of the shooting at approximately 7:42 a.m., picked up the bicyclist at approximately 7:43 a.m., and drove to Demetrise Williams's residence, arriving at approximately 7:48 a.m.

Williams testified defendant, a friend she knew as "Maine," called her twice on July 30, 2018, at approximately 7:49 a.m. and 7:51 a.m., asking if he could stay with her because his girlfriend had kicked him out of her house after an argument. Defendant's girlfriend lived on the same block as Williams. Williams told defendant he could stay with her, and defendant arrived at her home, approximately five to ten minutes later. He was carrying an inflatable mattress box that he put in her living room closet. She also testified that defendant left and then came back later with his cousin, Dametre Tokley.

Williams said that Tokley, whom she knew as "Meech," knocked on her door while defendant was inside her home. She told Tokley that she did not want him in her home, and both defendant and Tokley left. Williams also testified that she did not know a person named Nasir Mason, and that he was not at her home on the morning of July 30, 2018.

Detectives located the parked Chevy and as they conducted surveillance, they saw defendant and Tokley enter a store, and drive to Williams's house. Both defendant and Tokley were stopped and were taken into custody. A testifying detective stated that Devon Fisher and Tokley were suspected drug dealers in the area of the shooting.

After defendant and Tokley were arrested, Williams's house was searched. During the search, a gun fell out of the closet in the living room. The gun was a semi-automatic .40 Glock model 22 handgun, which contained a round in the chamber, as well as a loaded extended round magazine. Subsequent testing did not reveal any fingerprints or usable DNA on the handgun.

During a search of the Chevy, officers recovered four cell phones, $440 in cash, two clear plastic bags, and eighty-nine zipper-lock plastic baggies which contained a substance that was suspected to be heroin, stamped on the front with the words "Call of Duty." The search of the vehicle also recovered the following: a black hooded sweatshirt, a bucket hat, a reversible camouflage bucket hat, a black mask, blue disposable gloves, an identification card and mail belonging to Tokley. The bullets in the magazine, as well as the one in the firing chamber of the handgun, all had the same "Win 40 S&W" stamp.

5

## II.

A grand jury charged defendant and Tokley in an indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1) (count two); first-degree attempted murder, N.J.S.A. 2C:5-1(a) and N.J.S.A. 2C:11-3(a)(1) (count three); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count four); second-degree possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39(5)(b) (count six). Defendant was separately charged with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count seven); and first-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(j) (count eight). The cases were severed for trial.

## III.

Defendant voluntarily gave a statement to the police after his arrest, which was played for the jury. He denied knowledge of or any involvement in the shooting. Defendant stated that he lived in Lindenwold and also with his child's mother in Camden but on July 29, 2018, he stayed in a motel. On the morning of July 30, 2018, Tokley picked him up at the motel and dropped him off at the child's mother's house, later picking him up again. According to defendant, after

A-3391-21

they stopped at another friend's house and went to a store, Tokley parked his car and the police stopped them.

Defendant told the police that at some point that morning, Tokley picked up a person called "Naz" and dropped him off at a store near the scene of the shooting. Defendant did not know Naz's real name.

When the Chevy was processed for evidence, fingerprints were found on the car's exterior. Testing of the fingerprints returned as potentially matching those of Nasir Mason. Testifying officers stated they did not consider Mason a suspect in Rojas's homicide and did not investigate him.

At the time of his arrest, defendant was wearing Nike sneakers. Based on the surveillance videos, it appeared to the investigating officers that the shooter was wearing Nike sneakers. After being shown the video footage during his interview, defendant told the officers that he was not the person in the picture.

Tokley signed an affidavit, which was read into the record during the trial. He stated he placed the gun in the closet at Williams's house, and he was alone when he did so.

IV.

Prior to trial, defendant moved to limit the State's firearm expert's testimony under N.J.R.E. 702 and N.J.R.E 403. Defendant did not challenge the

7

expert's qualifications, instead he argued that the firearm toolmark identification testimony was not scientifically reliable under the Daubert[1] standard. The court denied the motion, determining that the expert testimony on firearm and toolmark identification "[wa]s well-established," and New Jersey courts had repeatedly found toolmark analysis scientifically reliable under the Frye[2] standard and Rule 702. The court further stated that defendant failed to prove that the prejudicial value of the evidence was outweighed by its probative value under Rule 403. The court subsequently issued a written order consistent with its oral decision.

Sergeant Edward Burek, Jr. of the New Jersey State Police was admitted as an expert in firearms and toolmark identification. He testified that he examined and tested the handgun, five shell casings, and nine bullet fragments recovered during the murder investigation. He explained that the testing performed on the discharged metal bullet jackets revealed that the bullets found at the crime scene were fired from the suspected handgun because the test jackets and sample jackets had the same microscopic features. He also explained that the tests performed on the discharged bullet cartridge cores indicated that they

---

[1]  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

[2]  Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

8

were fired from the suspected handgun because the test and sample cartridge cores had the same extractor marks and firing pin drag, which are features unique to a specific firearm. Burek testified that the suspected handgun was operable and capable of being discharged, and that the magazine fit and properly functioned with the suspect handgun.

Burek concluded that the "discharged metal jackets" found at the scene were "discharged from . . . [the] firearm" found in Williams's closet. He also testified that three bullet fragments found during the autopsy were "discharged from the submitted pistol."

V.

During the trial, the court denied defendant's motion to take judicial notice of Nasir Mason's criminal history and the facts surrounding Mason's convictions. Mason had been arrested on drug charges in the same neighborhood where the shooting occurred. Defendant argued that Mason's convictions supported his third-party guilt defense that Mason shot and killed Rojas.

The court denied the motion, finding defendant's request was beyond the scope of judicial notice under N.J.R.E. 201(b)(4), and it would be improper to take judicial notice of judgments of conviction "simply because they have been

filed with a court," and that admission of such evidence would inappropriately "circumvent the rule against hearsay." The court further found that defendant sought relief based on "pure speculation" because he did not present any evidence that either Mason or Rojas sold drugs, that the two were drug rivals, that Mason killed Rojas because of that rivalry, or that Mason was the person referenced as "Naz."

## VI.

The court also denied defendant's motion for an alibi jury instruction. The court found that defendant did not comply with the notice requirements under Rule 3:12-2 but even if he had, the evidence did not support an alibi instruction because defendant failed to establish proof of an alibi. The court subsequently issued a written order consistent with its oral decision.

## VII.

The jury found defendant guilty of counts one, two, four, five, and six and acquitted him of count three. The jury subsequently found defendant guilty of the certain persons offenses.

The court sentenced defendant to an aggregate term of seventy-five years, with an eighty-five-percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

A-3391-21

VIII.

On appeal defendant raises the following points for our consideration:

POINT I
THE TRIAL COURT ERRED IN ALLOWING UNRELIABLE EXPERT TESTIMONY PURPORTING TO DETERMINE THAT THE GUN FOUND WHERE DEFENDANT WAS STAYING WAS THE ONE THAT FIRED THE SHOTS THAT KILLED THE VICTIM.

A. The Trial Court Has a Duty to Ensure that Only Reliable Forensic Testimony is Admitted.

B. Firearms and Tool Mark Examination—A Primer.

C. There Is No Scientific Basis For The Claim That Firearms Examiners Can Definitively Determine That Ammunition Came From A Specific Gun. Testimony . . . That Purports To Do So Is Unreliable.

D. The Expert's Testimony That The Guns And Casings Were Fired From The Specific Gun Was Scientifically Unsupported and Unreliable. Its Admission Was Unduly Prejudicial And Necessitates Reversal of Defendant's Convictions.

POINT II
THE TRIAL COURT ERRED IN PRECLUDING THE DEFENSE FROM ELICITING RELEVANT AND PROBATIVE TESTIMONY THAT SUPPORTED ITS THIRD-PARTY GUILT DEFENSE AND ALLOWING THE STATE TO IMPROPERLY UNDERMINE IT.

POINT III
THE PRESENTATION OF AN ILLEGALLY INCORRECT BASIS TO FIND DEFENDANT GUILTY, COMBINED WITH JURY INSTRUCTIONS THAT WERE INSUFFICIENT TO GUIDE THE JURY IN ITS DELIBERATIONS, REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. The State Argued An Incorrect Theory Of Accomplice Liability, And The Trial Court's Instruction Did Not Correct The Legal Misconception Presented To The Jury.

B. The Trial Court Failed To Provide Two Necessary Instructions: The Identification And Alibi Charges.

C. The Improper Explanation Of Accomplice Liability, As Well As The Missing Identification And Alibi Instructions, Require Reversal Of Venable's Convictions.

POINT IV
BECAUSE THERE IS NO EVIDENCE OF ANY AGREEMENT, A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON THE CHARGE OF CONSPIRACY TO COMMIT MURDER.

POINT V
EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VI
AT SENTENCING, THE TRIAL COURT IMPROPERLY CONSIDERED ARRESTS THAT DID

12

NOT LEAD TO CONVICTIONS AND FAILED TO CONSIDER THE IMPACT OF DEFENDANT'S ADVANCED AGE AT RELEASE. THE SENTENCE MUST BE VACATED, AND THE MATTER REMANDED FOR A RESENTENCING.

IX.

We begin by considering defendant's argument regarding the expert ballistics testimony. He contends the trial court erred by allowing the State to present unreliable expert testimony establishing the gun found at Williams's house was the one used by the shooter who killed Rojas.

We review a court's decision to admit or bar evidence for an abuse of discretion. State v. Nelson, 173 N.J. 417, 470 (2002).

In his pretrial motion, defendant sought to bar the State's firearms expert from using the following terms: "match," "positive identification," "identification," "individualization," and "no error rate." According to defendant, "there is no scientific basis for the claim that firearms examiners can definitively determine that ammunition came from a specific gun," and "testimony that purports . . . to do so is unreliable."

In its oral and written decisions denying the motion, the trial court noted that all the case law presented by defendant relied on the Daubert standard. The trial court cited to State v. Ghigliotty, 463 N.J. Super. 355 (App. Div. 2020), in

stating that "in criminal cases, the New Jersey Supreme Court has continued to rely on the Frye standard to access reliability.  Further, I find that the probative value of this proffered evidence outweighs any prejudicial impact."

Subsequent to the trial court's pre-trial ruling and the jury's verdict here, our Supreme Court reconsidered the standard for the admission of expert evidence under Rule 702 in criminal cases in State v. Olenowski, 253 N.J. 133, 139 (2023), and "going forward" adopted the Daubert standard in lieu of the Frye standard.  However, the Court stated:  "Nothing in today's decision disturbs prior rulings that were based on the Frye standard."  Id. at 154.  Moreover, the Court stated that when determining admissibility, "[j]udges may also continue to consider whether a principle is generally accepted by the scientific community."  Id. at 152.

For expert testimony to be admitted under Rule 702,

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [In re Accutane Litig., 234 N.J. 340, 349 (2018) (quoting State v. Kelly, 97 N.J. 178, 223 (1984)).]

At the time of defendant's trial in February 2022, a proponent of scientific evidence could establish the second prong of the test by presenting:

> (1) . . . expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) . . . authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) . . . judicial opinions that indicate the expert's premises have gained general acceptance.
>
> [Kelly, 97 N.J. at 210.]

However, "[p]roof of general acceptance does not mean that there must be complete agreement in the scientific community about the techniques, methodology, or procedures that underlie the scientific evidence." State v. Chun, 194 N.J. 54, 91-92 (2008). Further, general acceptance

> does not require complete agreement over the accuracy of the test or the exclusion of the possibility of error. . . . Neither is it necessary to demonstrate that the techniques, methodology, and procedures are infallible. Nor is it necessary that acceptance within the scientific community be unanimous. . . . . Every scientific theory has its detractors.
>
> [State v. Harvey, 151 N.J. 117, 171 (1997).]

As we have previously stated: "[T]ool mark analysis is not a newcomer to the courtroom." State v. McGuire, 419 N.J. Super 88, 130 (App. Div. 2011). "Testimony by tool mark experts has been admitted in New Jersey courts [under

15

the Frye standard] without objection," as well as in "other jurisdictions." Id. at 130-31; see also Ghigliotty, 463 N.J. Super. at 375 (discussing well-established history of tool mark identification experts in New Jersey ballistics jurisprudence).

The trial court properly admitted the State's expert testimony under Rule 702 and Frye. Burek's testimony concerned a subject matter "beyond the ken of the average juror," Burek's field was "at a state of the art such that an expert's testimony could be sufficiently reliable," and Burek had "sufficient expertise to offer the . . . testimony." In re Accutane, 234 N.J. at 349 (quoting Kelly, 97 N.J. at 223).

The trial court correctly pointed out that defendant's argument was substantially reviewed and rejected by this court in McGuire. There, we considered and rejected one of the authorities on which defendant relies here, the 2009 NAS study.[3] We explained:

> Defendant's criticism of tool mark analysis is extrapolated from commentary in [the 2009 NAS report, which] . . . was issued . . . after defendant's trial. It contains some criticism of tool mark analysis, including lack of information about variances among individual tools, lack of a clearly defined process, and

---

[3] In support of his argument before the trial court, defendant provided three reports generated by the National Research Council and the President's Council of Advisors on Science and Technology (NAS), dated 2008, 2009, and 2016.

a limited scientific base of knowledge. . . . But the NAS report does not label the discipline "junk science." It acknowledges that tool mark analysis can be helpful in identifying a class of tools, or even a particular tool, that could have left distinctive marks on an object. . . . The report concludes that development of a precisely specified and scientifically justified testing protocol should be the goal of tool mark analysis. . . .

Since the NAS report was issued, at least two courts have refused to exclude forensic evidence based on criticism contained in that report. See United States v. Rose, 672 F. Supp. 2d 723, 725 (D. Md. 2009) (fingerprint analysis); Johnston v. State, 27 So. 3d 11, 20-23 (Fla.) (fingerprint and footwear analysis), cert. denied, . . . 31 S. Ct. 459 . . . (2010). As noted in those cases, the purpose of the NAS report is to highlight deficiencies in a forensic field and to propose improvements to existing protocols, not to recommend against admission of evidence.

[McGuire, 419 N.J. Super. at 131-32.]

On appeal, defendant continues to rely on the NAS reports and case law solely premised on the Daubert standard, despite the Court's ruling in Olenowski. The argument lacks merit.

Here, the trial court correctly determined that under existing case law, firearm and tool mark identification is based on "a foundation of knowledge," that has been "organized over time," and "described in forensic [textbooks], scientific literature, reference material[s], training manuals, and peer-reviewed scientific journals." Defendant had the opportunity to challenge the reliability

17

and credibility of the expert's testimony on cross-examination. The trial court did not err in denying defendant's motion and permitting the State's expert ballistics testimony.

X.

Defendant claims that the trial court erred by restricting him from eliciting relevant and probative testimony that supported his third-party guilt defense. According to defendant, "[t]he defense theory was that Tokley committed the crime with Nasir Mason," and "that Mason had the motive to kill Rojas because they were engaged in a drug dealing rivalry."

As stated, defendant requested the court take judicial notice of Nasir Mason's criminal history. Rule 201(b)(4) provides that the court may judicially notice a fact, including the "records of the court in which the action is pending and of any other court of this state or federal court sitting for this state." N.J.R.E. 201(d) provides that "[t]he court shall take judicial notice if a party requests it on notice to all other parties and the court is supplied with the necessary information."

"The purpose of judicial notice is to save time and promote judicial economy by precluding the necessity of proving facts that cannot seriously be disputed and are either generally or universally known." State v. Silva, 394 N.J.

Super. 270, 275 (App. Div. 2007) (noting case law supports the "proposition that facts that can be reasonably questioned or disputed may not be judicially noticed"). "Judicial notice cannot be used 'to circumvent the rule against hearsay and thereby deprive a party of the right of cross-examination on a contested material issue of fact.'" Ibid. (quoting RWB Newton Assocs. v. Gunn, 224 N.J. Super. 704, 711 (App. Div. 1988)). "Because judicial notice may not be used to deprive a party of cross-examination regarding a contested fact, the doctrine also cannot be used to take notice of the ultimate legal issue in dispute." Ibid.

The United States Constitution and the New Jersey Constitution "guarantee criminal defendants a meaningful opportunity to present a complete defense." State v. Handy, 215 N.J. 334, 350 (2013) (quoting State v. Garron, 177 N.J. 147, 168 (2003) (internal quotation marks omitted)). "The constitutional right to present a defense confers on the defendant the right to argue that someone else committed the crime." State v. Fortin (Fortin II), 178 N.J. 540, 590 (2004). "Evidence in support of third-party guilt, or any theory offered by the prosecution or defense, must satisfy the standards of the New Jersey Rules of Evidence." Id. at 591. To do so, "the proof offered [must have] a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." Ibid. (quoting State v. Sturdivant, 31 N.J. 165, 179

(1959)).  "That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt."  State v. R.Y., 242 N.J. 48, 66 (2020) (quoting State v. Perry, 225 N.J. 222, 238 (2016)).

"[O]rdinarily, and subject to rules of competency, an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made."  State v. Garfole, 76 N.J. 445, 453 (1978).  However, in advancing a theory of third-party guilt, "[t]he connection between the third party and the crime cannot be left to conjecture."  Fortin II, 178 N.J. at 591.  Indeed, "the concern with respect to claims of third-party guilt is 'the ease in which unsupported claims may infect the process.'"  R.Y., 242 N.J. at 66 (quoting State v. Loftin, 146 N.J. 295, 345 (1996)).  "To avoid that issue, a defendant may not seek to introduce evidence in order 'to prove some hostile event and leave its connection with the case to mere conjecture.'"  Id. at 66-67 (quoting Sturdivant, 31 N.J. at 179).  "[T]he evidence a defendant seeks to admit in support of a third-party guilt defense must be capable of demonstrating 'some link between the [third-party] evidence and the victim or the crime.'"  Perry, 225 N.J. at 239 (second alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 301 (1988)).  In other words,

20

"[s]omewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case." Sturdivant, 31 N.J. at 179.

"The decision to admit or exclude evidence of third-party guilt is particularly fact-sensitive and rests within the trial court's discretion." R.Y., 242 N.J. at 67 (quoting Perry, 225 N.J. at 239) (internal quotation marks omitted). "We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). Courts will not substitute their judgment unless the evidentiary ruling is "so wide of the mark" that it constitutes "a clear error in judgment." State v. Medina, 242 N.J. 397, 412 (2020) (first quoting State v. Brown, 170 N.J. 138, 147 (2001); and then quoting State v. Scott, 229 N.J. 469, 479 (2017)).

Defendant requested the trial court take judicial notice under Rule 201(b)(4) that, among other things, Mason was charged in December 2018 with first-degree aggravated manslaughter, fourth-degree aggravated assault by pointing a firearm, and second-degree possession of a weapon for an unlawful purpose and convicted in 2019 of third-degree possession with the intent to distribute a controlled dangerous substance. Defendant also sought judicial

notice that "[Mason's] drug distribution took place on June 11, 2018, and that it occurred in the area of 4th and Liberty in Camden, New Jersey."

Defendant further requested the court take judicial notice that in May 2021,

> Nasir Mason was charged with drug offenses, unlawful possession of a weapon, receiving stolen property, resisting arrest, certain persons not to possess a weapon, and that on July 21, 2021, Nasir Mason was indicted for third-degree resisting arrest, third-degree possession of a controlled dangerous substance, third-degree possession with intent to distribute a controlled dangerous substance, second-degree unlawful possession of a handgun, and second-degree certain persons not to have a firearm.

Defendant argued that the facts were "relevant to [his] third-party guilt defense in that they show . . . Mason's motive, opportunity, and ability to kill . . . Rojas."

The court denied the application in a well-reasoned written decision. The court determined the request was "beyond the scope of N.J.R.E. 201(b)(4)," finding it "cannot take judicial notice of the contents of a criminal complaint, judg[]ment of conviction, or probable cause statement for the purpose of determining the truth of what they assert simply because they have been filed with a court and thus were a part of a court record." The court also noted that "evidence sought for judicial notice cannot circumvent the rules of evidence."

A-3391-21

The court stated:

> Defense [c]ounsel has failed to provide this [c]ourt with any evidence to corroborate their theory that the proffered facts show that . . . Mason had a motive to kill . . . Rojas and wound . . . Fisher. Rather he is seeking this relief on pure speculation. For instance, there has been nothing presented to the [c]ourt to support [c]ounsel's argument that the victim and . . . Mason were drug rivals. There was also nothing shared with the [c]ourt that the victim sold drugs, but it appears to be uncontested by the parties that the victim was found with drugs in his possession. However, even if the victim sold drugs, there is not a scintilla of corroborating information that . . . Mason wanted to kill the victim because the victim sold drugs.
>
> . . . I find that the [d]efense has failed to show a connection between two people selling drugs in an urban community and a motive for the murder of the victim. Instead, the [d]efense would have this [c]ourt speculate a connection between . . . Mason's 2019 conviction and the motive for the victim's death.
>
> I also find that there is no supporting evidence to suggest that . . . Mason is the individual identified as "Naz." Rather, [d]efense [c]ounsel has left the identification of "Naz" to mere conjecture whereby he seeks the [c]ourt to accept his theory that "Naz" is an abbreviation for Nasir as the name Joe would be an abbreviation for the name Joseph.

Nevertheless, the court's order permitted defendant "to present testimony that . . . Mason was arrested on June 11, 2018, the charges he was arrested on, and the location of the incident."

23

Notwithstanding the order, defense counsel sought to elicit additional information, specifically "from the arresting officer that . . . Mason was arrested with suspected heroin, and the brand of the heroin, or the stamp that was on the heroin." Defense counsel explained:

> I think it's very relevant to show that . . . these are different stamps. . . . Rojas' brand is Call of Duty. . . . Mason's brand is Mr. Nice Guy. So these are different brands.
>
> And I think that's important to . . . come in, in order for me to be able to argue that these are rival drug dealers because they're selling different brands.

In again denying the application, the court responded:

> There's absolutely no evidence that this person Na[z] is . . . Mason. . . . There's absolutely no evidence that you've shown this [c]ourt that there was even a drug rivalry amongst the parties in this area.
>
> If you look at inner cities, . . . and some suburban communities, there are different facets of people that sell drugs. But it does not mean there's a drug rivalry unless you have evidence to come in the courtroom with. Not speculation, but evidence. And that's what the law says.
>
> I'm not allowing you to go into brands. I am only allowing the three areas that I stated, date of arrest, location of arrest, and what this individual was charged with.

24

Several days later, defense counsel again raised the issue and asked the court to permit "evidence regarding the fact that . . . Mason was arrested with heroin that was stamped with the brand 'Mr. Nice Guy.'" The court declined the request, explaining:

> You want to put into the case—your theory is that there was a rivalry between someone named Nas, who's not identified as . . . Mason. . . . That there was a rivalry between the victims and someone named Nas. That's what's before the [c]ourt. That's all that's before the court.
>
> . . . There's . . . absolutely no evidence that there was a rivalry between . . . Mason and . . . the victims.
>
> Your proposition is that they both sold different types of drugs that w[ere] stamped with different names. Respectfully, my response is[] so what? So what they sold two different types of drugs? Vendors on the street sell different types of articles. Stores themselves sell different types of articles. The mere fact the world is driven by competition in the business world. To sell drugs is illegal, but it's a business. People look at it as a business. There's always competition in business.
>
> But you have absolutely not a scintilla of any evidence that . . . Mason and the victims were involved in a drug rivalry. . . .
>
> I've allowed you to put forth, . . . that . . . Mason sold drugs . . . a month before or was arrested a month before this incident. I'm still allowing you to do it. There's no relevancy. . . . But I still allowed you to do it.

A-3391-21

You're permitted to bring in the [o]fficer pursuant to my order. . . . That will bring out the location that . . . Mason was arrested, the date of his arrest, and what his arrest charges were for. That's it.

. . . Mason is not on trial before the [c]ourt. You have nothing that ties in your theory of some type of drug rivalry. I'm not going to allow you to go any further than that.

We are satisfied the court's rulings were supported by its factual findings and the applicable case law. The court correctly determined it could not take judicial notice of the contents of a criminal complaint, judgment of conviction, or probable cause statement for the purpose of determining the truth of what they assert simply because they had been filed with a court and were part of a court record. See RWB, 224 N.J. Super. at 711 ("[A] court may not take judicial notice of the contents of a certification for the purpose of determining the truth of what it asserts simply because the certification has been filed with a court and thus is part of a court record."). The documents defendant sought to introduce were in an unrelated criminal case and defendant failed to prove any relevance to the present case.

Moreover, judicial notice cannot be used to circumvent hearsay rules and deprive a party the right of cross-examination on a contested material issue of

fact.  Silva, 394 N.J. Super. at 275.  Nor can it be used to take notice of the ultimate legal issue in dispute.  Ibid.

While the fact that Mason was arrested and convicted of certain crimes is not in dispute, the identity of the shooter in defendant's case is.  In seeking to use judicial notice, defendant attempted to create reasonable doubt through the admission of hearsay evidence impervious to challenge by cross-examination.  Mason was not on trial and was not expected to be called as a witness in defendant's trial and the State would have no opportunity to test that evidence.  Nevertheless, the court did permit defendant to present certain evidence regarding Mason's June 11, 2018 arrest, the resulting charges and the location of the incident.

Defendant also sought to present to the jury that the heroin Mason sold was stamped with a different brand name than the heroin found in Rojas's car when he was shot and killed.  He argued that because Mason and Rojas sold different types of heroin, there must have been a rivalry between the two which provided Mason a motive to murder Rojas.  But defendant did not provide any evidence to show that Rojas was a drug dealer, that there was a rivalry between Mason and Rojas, or that Mason had a motive to kill Rojas.  Although we recognize Mason's fingerprint was on the Chevy and defendant claimed Mason

was in Camden on the morning of July 30, 2018, there was no credible evidence to support the alleged rivalry that would have motivated Mason to shoot Rojas.

As the trial court stated several times, defendant's arguments are pure speculation and prohibited under the case law which provides that "[t]he connection between the third party and the crime cannot be left to conjecture." Fortin II, 178 N.J. at 591. The trial court correctly determined that it was improper for defendant to attempt to introduce Mason's arrest and leave it to the jury to connect Mason to Rojas's murder through mere conjecture.

## XI.

Defendant next contends the State argued an incorrect theory of accomplice liability and the trial court's instruction did not correct the legal misconception. He asserts "[t]he combination of the inadequate instruction and incorrect argument was clearly capable of causing an unjust result and mandates reversal."

During his summation, the prosecutor said:

> [T]he [j]udge is going to explain to you something that's called accomplice liability. Now, I want to talk to you about this a little bit. The accomplice liability charge is interesting, because it says that if another person committed the crime of murder, that the defendant aided, agreed, or attempted to aid another person, in the planning or commission of the murder, the defendant's purpose was to promote or

28

facilitate the commission of a murder, and the defendant possessed the criminal state of mind required to be proved purpose of knowledge against the person who committed the murder.

And what does all that mean? What that means is that even if you didn't believe that this [d]efendant was the one who pulled the trigger, he's still guilty, because they acted together. That he acted with . . . Tokley, and that they committed the murder, and that he aided him.

What does it mean to aid somebody? To help them. It means calling a friend to help you hide the murder weapon, so that you won't get caught.

Again, [that is] certainly not the State's contention here. It is the State's contention that this [d]efendant pulled the trigger. But even if you didn't believe that, he's still guilty.

[(Emphasis added).]

According to defendant, "in summation, the State suggested for the first time that [defendant] could have been an accomplice and presented to the jury an incorrect version of accomplice liability: that a person who helps conceal evidence of a murder after the fact is an accomplice in the murder itself." Defendant states: "In summation, the State argued that [defendant] would be guilty of murder as an accomplice if Tokley was the shooter and [defendant] hid the gun later."

There was no objection to the statement. When opposing counsel fails to object to the complained about comments during summation, those remarks are viewed under the plain error standard. R. 1:7-2; R. 2:10-2. Under that standard, an unchallenged error constitutes plain error if it was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." State v. R.K., 220 N.J. 444, 456 (2015).

We disagree with defendant's appraisal of the prosecutor's comments. A plain reading of the above passage reveals that the prosecutor stated that even if defendant was not the shooter, he could still be found guilty as an accomplice if he: aided, agreed to aide, or attempted to aid Tokley with the murder of Rojas; and purposefully promoted or facilitated the commission of the murder of Rojas; and possessed the requisite criminal state of mind. In other words, defendant could be guilty as an accomplice if he: acted together with Tokley, and they committed the murder, and defendant aided Tokley (the shooter in that scenario) in murdering Rojas.

The prosecutor made it clear that it was the State's position that defendant was the shooter, but even if the jury did not believe that defendant was the

shooter, he could still be guilty if the jury believed that defendant knowingly acted together with Tokley to murder Rojas and purposefully aided Tokley in murdering Rojas.

Moreover, the court instructed the jury that the prosecutor was an advocate and that his comments and summation were not evidence. The court also told the jury that it was the court's responsibility, not the prosecutor's, to instruct the jury on the law. It provided an accurate and comprehensive instruction regarding the jury's consideration of defendant's accomplice liability if it deemed Tokley to have been the principal. The jury is presumed to have understood and followed those instructions. State v. Feaster, 156 N.J. 1, 65 (1998).

## XII.

Next, defendant contends the jury was not given two necessary instructions—regarding identification and an alibi. Defendant only requested the alibi instruction.

"An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997). "Correct jury instructions are 'at the heart of the proper execution of the jury function in a criminal trial.'" Ibid. (quoting State v. Alexander, 136 N.J. 563,

571 (1994)). The trial judge must explain the law as it relates to the facts and issues of the case. State v. Baum, 224 N.J. 147, 159 (2016). Erroneous jury instructions on "material" aspects are assumed to "possess the capacity to unfairly prejudice the defendant." Ibid. (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). Incorrect instructions are "poor candidates for rehabilitation under a harmless-error analysis," State v. Rhett, 127 N.J. 3, 7 (1992), and are "excusable only if they are harmless beyond a reasonable doubt." State v. Vick, 117 N.J. 288, 292 (1989). "As an indication of the paramount importance of accurate jury instructions, we have held that erroneous instructions on material issues are presumed to be reversible error." State v. Marshall, 173 N.J. 343, 359 (2002).

A reviewing court must evaluate the jury charge in its entirety to determine its overall effect. State v. Savage, 172 N.J. 374, 387 (2002). We do so "to ascertain whether it is either ambiguous and misleading or fairly sets forth the controlling legal principles relevant to the facts of the case." State v. LaBrutto, 114 N.J. 187, 204 (1989).

Defendant asserts the trial court erred by failing to provide the necessary identification jury instruction because he disputes that he was the person on the

bicycle. Therefore, defendant contends the court should have instructed the jury with the model charge on identification when no identification has been made.

Because defendant did not object to the jury instruction, we review his claim for plain error. R. 2:10-2.

The model jury charge on identification instructs the jury that it must determine "not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it." Model Jury Charges (Criminal), "Identification: No In- or Out-of-Court Identification" (Oct. 26, 2015).

"When identification is a 'key issue,' the trial court must instruct the jury on identification, even if a defendant does not make that request." State v. Cotto, 182 N.J. 316, 325 (2005) (citing State v. Green, 86 N.J. 281, 291 (1981)). "Identification becomes a key issue when '[i]t [is] the major . . . thrust of the defense,' . . . particularly in cases where the State relies on a single victim-eyewitness." Ibid. (quoting Green, 86 N.J. at 291). In State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003), this court explained:

> [A]s a matter of general procedure a model identification charge should be given in every case in which identification is a legitimate issue. . . . The failure to give such a charge or to give an adequate

charge is most often reversible error. . . .  While in some instances it may not be necessary to present an extended charge on identification, nevertheless, the complete absence of any reference to identification as an issue or as an essential element of the State's case is improper.

That is not the situation in the present case.  In Cotto, our Supreme Court held and explained:

> [D]espite the trial court's failure to provide a detailed identification instruction, the trial court did specifically explain to the jury that the State bears the burden of proving beyond a reasonable doubt "each and every element of the offense, including that of the defendant's presence at the scene of the crime and his participation in the crime."  Unlike the trial court in Davis, here, the trial court instructed the jury on the State's burden of proving beyond a reasonable doubt that [the] defendant was the individual that committed the crime.  The instruction in this matter is substantially the same as the model instruction that the Appellate Division, in Davis, would have required to uphold the conviction in a case of a weak misidentification argument.  The Davis instruction stated, in pertinent part:  "You must determine . . . not only whether the State has proved each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proved beyond a reasonable doubt that this defendant is the person who committed it."  Davis, 363 N.J. Super. at 562 (quoting Model Jury Charges (Criminal), "Identification" (1999)).  The instruction given in this case, in Davis, and in the model charge all emphasize the same common denominator:  the State bears the burden of proving beyond a reasonable doubt that the defendant is the wrongdoer.  Although the court here did not use the word "identification" in charging the jury, and could have given a more detailed instruction,

it nonetheless clearly explained the State's burden to the jury. Therefore, we hold that the trial court did not commit error, much less plain error, when it instructed the jury on identification.

[Cotto, 182 N.J. at 326-27 (citations reformatted).]

Here, as in Cotto and Davis, the court provided the jury with the general jury charge that the State bore the burden of proving beyond a reasonable doubt that defendant was the wrongdoer; in other words, that he murdered Rojas. The court instructed the jury:

> Defendant has pled not guilty to the charges. Now, a defendant on trial is presumed to be innocent. And unless each and every essential element of an offense charge is proved beyond a reasonable doubt, the [d]efendant must be found not guilty of that charge.
>
> The burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the [d]efendant. The [d]efendant in a criminal case has no obligation or duty to prove his innocence or offer any proof relating to his innocence.
>
> The [p]rosecution must prove its [c]ase by more than a mere preponderance of the evidence, yet not necessarily to an absolute certainty. The State has the burden of proving the [d]efendant guilty beyond a reasonable doubt.

The court also instructed the jury regarding the State's burden of proof on the specific charges against him. Regarding murder, the court stated:

35

I will now move on to the third part of my instructions on the portions of the Criminal Code that you must apply to the facts you find, to determine whether the State has proven beyond a reasonable doubt that . . . [d]efendant violated a specific[] [c]riminal [s]tatute.  The [s]tatute read together with the indictment identifies the elements which the State must prove[] beyond a reasonable doubt to establish the guilt of . . . [d]efendant on each of the counts in the indictment.

I will start with count one.  In count one . . . [d]efendant is charged with the murder of . . . Rojas.  Count one of the indictment reads on or about the 30th day of July 2018 in the City of Camden, County of Camden within the judgment of this [c]ourt . . . Venable did purposely and knowingly cause the death or serious bodily injury resulting in the death of . . . Rojas.

A person is guilty of murder if number one, he caused the victim's death or serious bodily injury that resulted in death.  And number two. . . [d]efendant did so purposely or knowingly.  In order for you to find . . . [d]efendant guilty of murder, the State is required to prove each of the following elements beyond a reasonable doubt.

Number one, that . . . [d]efendant caused . . . Rojas's death or serious bodily injury, that then resulted in . . . Rojas's death.  And number two, that . . . [d]efendant did so purposely or knowingly.

Similar instructions were given regarding each charge.

Although the trial court did not provide the specific model jury charge on identification, we are satisfied that the charges given to the jury clearly

36                                                          A-3391-21

explained the State's burden. There was no plain error in not instructing the jury with the identification charge.

## XIII.

Defendant also contends the trial court erred by failing to provide the alibi jury instruction. He asserts because he says he was elsewhere at the time of the murder—specifically driving around and being in various locations—he was entitled to the model charge on alibi.

After the State and the defense had rested, defense counsel requested the alibi instruction for the first time, during the jury charge conference. In denying defendant's request, the court determined that defendant had not provided the required notice pursuant to Rule 3:12-2. Defense counsel acknowledged the requisite notice was not provided to the State. Defense counsel also conceded there were no alibi witnesses. Instead, counsel argued that defendant's July 30, 2018, statement to police that he was at his child's mother's house at the time of the shooting was an alibi.

After reviewing both the transcript and the recording of defendant's statement to police, the trial court determined defendant's statement was not an alibi, explaining:

> I find that [d]efense [c]ounsel's argument that . . .
> [d]efendant was not in the vehicle at the time of the

shooting and that he was at [his child's mother's house] is more akin to a general denial of having knowledge of the crime. The [c]ourt notes that the [d]efendant was not able to provide a time period that he was at [his child's mother's house]. Defendant simply stated that at some time during the morning of July 30[], 2018, he was at [his child's mother's house] on two occasions. On one occasion . . . [d]efendant believed it was 7:30 [a.m.] The shooting in this matter occurred at approximately 7:42 [a.m.] This general denial of an offense is not an alibi. If this [c]ourt was to accept [d]efense [c]ounsel's reasoning, then every defendant who denies knowledge of an offense would be entitled to an alibi instruction.

Defendant provided neither notice under Rule 3:12-2, nor actual alibi evidence other than his denial that he committed the charged offense. We are satisfied the court did not err in its decision not to charge the jury with the alibi instruction. Moreover, "the failure to provide a separate alibi charge does not constitute reversible error." State v. Echols, 199 N.J. 344, 363 (2009). See, e.g., State v. Edge, 57 N.J. 580, 590-91 (1971) (holding failure to give requested alibi charge was harmless).

XIV.

Defendant also claims that because there was no evidence of his alleged agreement with Tokley to murder Rojas that his conviction for conspiracy to commit murder cannot stand. Defendant contends:

Even assuming that [he] was the shooter and Tokley was the driver in the car that picked him up, that is evidence only of an agreement to pick [him] up. That is not evidence that Tokley agreed [to] help [him] plan or commit the murder itself, which is what the conspiracy statute requires. N.J.S.A. 2C:5-2a.

. . . .

. . . Even if Tokley knew he was picking up [defendant] because he had just committed murder—of which there is no evidence in the record—that is not evidence that Tokley had agreed to aid [him] in committing murder, as opposed to merely helping him evade prosecution for murder.

Alternatively, he asserts that "the failure to properly instruct the jury that an agreement to aid someone after a murder does not constitute a conspiracy to commit murder requires reversal of [his] conspiracy conviction."

As these arguments were not raised before the trial court, we review them for plain error under Rule 2:10-2. "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." R.K., 220 N.J. at 456.

We begin with defendant's argument that there was no evidence of any agreement between him and Tokley to murder Rojas. Under N.J.S.A. 2C:5-2(a):

A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

The "major basis of conspiratorial liability [is] the unequivocal evidence of a firm purpose to commit a crime that is provided by the agreement." State v. Samuels, 189 N.J. 236, 245 (2007) (alteration in original) (internal quotation marks and citations omitted). "Because the conduct and words of co-conspirators is generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." Id. at 246 (quoting State v. Phelps, 96 N.J. 500, 509 (1984)).

"[T]here are no legal rules as to what inferences may be drawn. The question is one of logic and common sense." State v. Powell, 84 N.J. 305, 314 (1980). "When 'each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole,' judgment of acquittal is not warranted." Samuels, 189 N.J. at 246 (alterations in original) (quoting United States v. Brodie, 403 F.3d 123, 158 (3d Cir. 2005)).

40

Generally, the veracity of each inference does not need to be established beyond a reasonable doubt; rather, "a jury may draw an inference from a fact whenever it is more probable than not that the inference is true." State v. Brown, 80 N.J. 587, 592 (1979). "Nevertheless, the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof[] or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt." Ibid.

We are satisfied there was sufficient evidence in the record to support the jury's finding defendant guilty of conspiring with Tokley to murder Rojas. The State presented surveillance video showing defendant and Tokley in his Chevy at approximately 6:23 a.m. on July 30, 2018; the shooter riding a bicycle and firing a gun into Rojas's vehicle at approximately 7:42 a.m.; Tokley's Chevy driving up to the bicyclist; the shooter getting off the bicycle and into Tokley's Chevy at approximately 7:43 a.m.; and Tokley's Chevy arriving at Williams's residence at approximately 7:48 a.m.

Additionally, through surveillance video, Tokley's Chevy was tracked from the area of the shooting, driving to Williams's residence and arriving at approximately 7:48 a.m. Shortly thereafter, defendant and Tokley exited the Chevy, defendant entered Williams's house carrying a box while Tokley waited

outside, and then defendant and Tokley drove away minutes later.  The surveillance video did not show anyone getting in or out of Tokley's Chevy on the ride to Williams's residence after picking up the bicyclist and before arriving at Williams's residence.  Nor did the surveillance video show anyone other than defendant or Tokley entering or exiting Williams's house.

Furthermore, Franchi testified that he saw the shooter ride his bicycle away from the shooting and get into Tokley's Chevy at approximately 7:43 a.m.  Williams testified that defendant called her at approximately 7:49 a.m. and 7:51 a.m., shortly before arriving at her house carrying a box.

Even though there was no direct evidence that defendant and Tokley agreed to commit murder, there was sufficient circumstantial evidence to submit the conspiracy charge to the jury.  It is unlikely that Tokley drove defendant to Camden at approximately 6:42 a.m., dropped him off, and then unwittingly served as a getaway driver when he picked up defendant one block away and approximately one minute after the shooting.  As the Court stated in Samuels, although "the jurors could have reached a different conclusion . . . the fact that the evidence does not exclude every conceivable hypothesis except guilt is of no consequence to [its] analysis."  189 N.J. at 249.

We also discern no merit to defendant's contention that the trial court erred in the conspiracy charge given to the jury. For the first time, defendant asserts the court should have instructed the jury sua sponte "that an agreement to help [defendant] escape from the scene of the shooting does not constitute conspiracy to murder." Defendant relies on Grunewald v. United States, 353 U.S. 391 (1957), for support.

In Grunewald, there were acts of concealment done in furtherance of the main criminal conspiracy and other acts of concealment for purposes of covering up the crime, and the Government attempted to extend the statute of limitations by including the post-crime attempts to conceal the conspiracy as part of the main conspiracy. Id. at 405.

We disagree with defendant's contention that fleeing the scene of the crime, as he did here, equates to post-conspiracy concealment commensurate with that discussed in Grunewald. It does not. Moreover, the Grunewald Court did not require trial courts to instruct juries that attempts to cover up already accomplished crimes are distinct from the conspiracy itself.

The trial court gave the jury the appropriate conspiracy charge as applicable to the presented facts. It was not wrong for the jury to consider defendant and Tokley's behavior both before and after the murder to infer a

conspiracy. See Samuels, 189 N.J. at 248 (finding "[t]he evidence in its entirety and reasonable inferences therefrom were adequate to warrant submission of the charge" to the jury). The totality of the evidence does not support defendant's suggestion that Tokley "merely help[ed] him evade prosecution for murder." The trial court did not commit plain error for failing to instruct the jury sua sponte "that an agreement to help [defendant] escape from the scene of the shooting does not constitute conspiracy to murder."

XV.

We turn to a consideration of defendant's sentence. Defendant asserts the sentence was excessive because the court improperly considered arrests that did not lead to convictions and failed to account for his advanced age upon his release from prison when considering the appropriate aggregate sentence.

The court sentenced defendant to life imprisonment, seventy-five years, with an eighty-five-percent period of parole ineligibility under NERA on count one (first-degree murder); it merged counts two (conspiracy to commit murder) and five (second-degree possession of a weapon for an unlawful purpose) with count one. The court sentenced defendant to a concurrent ten-year term, subject to NERA, on count four (secondary aggravated assault); concurrent ten-year terms with five years of parole ineligibility on counts six (second-degree

44

unlawful possession of a weapon) and seven (second-degree certain persons not to have weapons); and a concurrent twenty-year term with ten years of parole ineligibility on count eight (first-degree unlawful possession of a weapon).

In sentencing defendant, the court found three aggravating factors: three (N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense")); six (N.J.S.A. 2C:44-1(a)(6) ("The extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted")); and nine (N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law")). The court did not find any mitigating factors and, as a result, determined that the aggravating factors convincingly and substantially outweighed the non-existing mitigating factors.

In sentencing a defendant, the "trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of the evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989). Trial courts "are given wide discretion so long as the sentence is within the statutory framework." State v. Dalziel, 182 N.J. 494, 500 (2005).

Our standard of review is "one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free

45

from the fear of second guessing.'" Id. at 501 (alteration in the original) (quoting State v. Megargel, 143 N.J. 484, 494 (1996)). "The reviewing court must not substitute its judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014).

"[J]udges may consider arrests and the actual circumstances of the offense when assessing the threat that a defendant poses to society during imposition of a sentence." State v. Jones, 179 N.J. 377, 407 (2004). See also State v. Green, 62 N.J. 547, 571 (1973), overruled on other grounds by State v. K.S., 220 N.J. 190 (2015) (holding while a charge that does not result in a conviction may be considered in sentencing, "[t]he important limitation of course is that the [court] shall not infer guilt as to any underlying charge with respect to which the defendant does not admit his guilt"). Indeed, "[s]entencing judges must fully assess the totality of circumstances surrounding a defendant's actual criminal offense." Jones, 179 N.J. at 407. "Standing alone, however, a charge may not be considered the equivalent of a finding of guilt," and it "may be considered only insofar as it is relevant to the character of the sentence." State v. Tanksley, 245 N.J. Super. 390, 396 (App. Div. 1991) (citing Green, 62 N.J. at 571). When a sentencing judge "weighs a defendant's record heavily because it is 'lengthy,' and the record is lengthy because of numerous charges or arrests that did not

result in convictions, the judge should state the reasons why those charges and arrests are relevant to the character of the sentence being imposed." Id. at 397.

Defendant asserts the trial court improperly considered "'a total of 20 arrests' as supporting the[] aggravating factors, even though [he] had only seven [S]uperior [C]ourt convictions, with the last conviction for a violent offense having been in 1991." We are unpersuaded by the argument.

The court correctly noted it could consider prior arrests during sentencing as part of the totality of defendant's criminal history and referenced all his prior arrests as part of his "prior contact with the court system." Specifically, the court stated:

> In reference to this matter, I have had the opportunity to review the Criminal Division presentence report and find that . . . [d]efendant has had prior contact with the court system. As an adult, he has had a total of 20 arrests, which resulted in six municipal court convictions, and seven [S]uperior [C]ourt convictions. I note that . . . [d]efendant has also had matters in the family court, which resulted in a final restraining order, contempt, and fines imposed against him.
>
> [(emphasis added).]

Although the court referenced all of defendant's arrests, it thereafter clearly focused on defendant's numerous convictions, as well as the "seriousness of the

offenses for which he has been convicted." The seriousness of the offense, first-degree murder, justified the imposed life sentence.

The court further noted that based on defendant's extensive criminal history, previous attempts to deter defendant's criminal conduct had failed because he continued to have contact with the justice system and was convicted for new offenses, even after lengthy terms of incarceration, parole, and probation. Defendant's criminal history, coupled with this most serious conviction of first-degree murder, demonstrates an unwillingness or inability to live a law-abiding life and refrain from violating the law.

Defendant also claims that the court failed to consider the impact of his advanced age upon release from prison "because older people are much less likely to commit crimes." This argument is meritless.

First, the court acknowledged defendant's age at the time of the crime and sentencing, and properly considered defense attorney's argument about defendant's advanced age.

Second, his argument is belied by his own actions. Defendant continued to have contact with the justice system and was convicted for new offenses as he aged. Indeed, his most serious conviction occurred when he was forty-six years old. Defendant did not learn from his prior convictions, nor did he

48

demonstrate that he was less likely to commit crimes as he got older. In fact, defendant continued to commit increasingly violent and dangerous crimes as he got older, even after he had been subject to numerous incarcerations, parole, and probationary terms intended to deter future criminal activity.

Third, and most importantly, defendant's argument does not properly consider the seriousness of offenses for which he was convicted, in particular, first-degree murder. Rather, defendant focuses on how old he would be at the time of his release. Notwithstanding his age, his lengthy criminal history coupled with the seriousness of his conviction for first-degree murder justified his life sentence.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3391-21